IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

LINDA CLARK                                                                                    PLAINTIFF

v.                              NO. 3:17-cv-00111 PSH

NANCY A. BERRYHILL, Acting Commissioner                                      DEFENDANT
of the Social Security Administration

### MEMORANDUM OPINION AND ORDER

Plaintiff Linda Clark ("Clark") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon the findings of an Administrative Law Judge ("ALJ").

Clark maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers three reasons why, one of which has merit.[1] Clark maintains that her residual functional capacity was erroneously assessed. It is Clark's position that she has work-related limitations caused by carpal tunnel syndrome, and the ALJ erred when he failed to account for those limitations.[2] The Court agrees.

---

[1]   The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

[2]   Clark also maintains that her residual functional capacity was erroneously assessed because the effects of her mental impairments were underestimated. Additionally, she maintains that the ALJ erred in crafting a series of questions to a vocational expert. There is no merit to either assertion.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). As a part of assessing the claimant's residual functional capacity, the ALJ is required to evaluate the claimant's subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ does so by considering the medical evidence and evidence of the claimant's "daily activities; duration, frequency, and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions." See Id. at 1218 [citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)].

The record reflects that Clark was born on February 5, 1973, and was thirty-eight years old on the alleged onset date, i.e., November 15, 2011. She alleged in her applications for disability insurance benefits and supplemental security income payments that she became disabled because of hypertension and bipolar disorder.

Clark has ably summarized the evidence. It is not necessary to reproduce the summary, save to note the following evidence germane to her carpal tunnel syndrome.

On October 30, 2013, Clark saw Dr. John House, M.D., ("House") for complaints that included right elbow and right wrist pain. See Transcript at 504-507. Clark was taking ibuprofen for the pain but reported that the medication was not helping ease the pain. She reported that she had previously worn a brace at night, but it was no longer of benefit. House's diagnoses included carpal tunnel syndrome. He prescribed diclofenac for the impairment.

2

House saw Clark again on November 19, 2013, primarily for Clark's complaints of a rash that had developed after she went deer hunting. See Transcript at 509-513. House examined Clark and observed that her musculoskeletal and neurological systems were within normal limits. Clark reported, though, that she had been experiencing pain in her right wrist for between one to six months, a pain she described as a dull, tingling, constant pain. They discussed Clark's complaints of pain, and he recommended that she wear a brace on her right wrist and see an orthopedist.

On December 4, 2013, Clark was seen by Dr. Spence Guinn, M.D., ("Guinn") at Dickson Orthopedics. See Transcript at 515-516. Guinn recorded Clark's complaints as follows:

> … [Clark] states that for quite some time, greater than 6 months or so, she has had increasing numbness in her right hand. Now it is constant. It wakes her at night. She is dropping objects and has some weakness in her hand. She states recently she has developed some early symptoms in her left as well. She has a soft brace. She has not tried a night splint. No other complaints.

See Transcript at 515. Guinn assessed "[c]linically severe right carpal tunnel syndrome" and scheduled Clark for a "right carpal tunnel release." See Transcript at 516.

Guinn performed the right carpal tunnel release and thereafter saw Clark on January 6, 2014, for a follow-up examination. See Transcript at 537. Clark reported good results from the surgery, reporting that her pain was significantly less than before the surgery.

Clark later underwent a left carpal tunnel release and then saw Guinn on January 29, 2014. See Transcript at 535-536. Clark reported that her left hand was doing well and her right hand was doing great.

In the months that followed, though, Clark continued to seek medical attention for the pain in her right wrist. See Transcript at 627-630 (04/30/2014), 571-572 (05/30/2014), 569-570 (06/06/2014), 567-568 (06/17/2014), 564-565 (07/09/2014), 559-562 (07/30/2014), 533-534 (08/08/2014), 554-555 (08/13/2014). She described the pain as a throbbing pain with numbness and tingling, and she reported difficulty grasping objects. She did acknowledge, though, that she was a "cake decorator" and used her arms and hands frequently. See Transcript at 567. She was prescribed medication and received nerve blocks, see Transcript at 569-570, 564-565, 559-562.

On September 2, 2014, Clark underwent a "[r]ight revision carpal tunnel syndrome release." See Transcript at 531. Guinn's notes reflect that the surgery was necessary because Clark had a recurrence of her symptoms.

In the following months, Clark continued to seek medical attention for the pain in her right wrist. See Transcript at 551-552 (09/10/2014); 549-550 (10/08/2014), 547-548 (11/03/2014), 544-546 (12/03/2014), 541-542 (12/30/2014), 655-657 (01/27/2015), 652-654 (02/24/2015), 648-651 (03/24/2015), 645-647 (04/22/2015), 641-644 (05/20/2015), 611-615 (06/23/2015), 706-711 (09/14/2015), 701-706 (11/18/2015). She reported that the pain interfered with her daily activities, see Transcript at 667, 652, 655, 648, and her overall pain level was reported to be ten, see Transcript at 547, 544, 541. Her right hand grip strength, though, was observed to be 4/5, see Transcript at 646, 642, and the results of musculoskeletal and neurological examinations were routinely within normal limits, see Transcript at 710, 704. When Clark was seen on September 14, 2015, an advanced practice registered nurse made the following findings with respect to Clark's musculoskeletal and neurological systems:

> Musculoskeletal: Motor strength and tone: normal tone and motor strength. Joints, bones, and muscles: no contractures, malalignment, tenderness, or bony abnormalities and normal movement of all extremities. Extremities: no cyanosis or edema.
>
> Neurologic: Gait and Station: normal gait and station. Cranial Nerves: grossly intact. Sensation: grossly intact. Coordination and Cerebellum: no tremor.

See Transcript at 710. Clark was prescribed medications that included gabapentin, see Transcript at 547, 549, 551, 667, and she reported that the medications helped ease her pain.

On July 23, 2015, Clark began seeing the medical professionals at the Northeast Arkansas Pain Medicine Center/Pain Center for the pain in her right arm. See Transcript at 667-670. She reported that a burning pain radiated from her right elbow to her right hand, and the fingertips on her right hand were numb. She reported that her pain was exacerbated by, inter alia, exercise, lifting, and work. She reported that her overall pain level was about a five. She also reported that her pain subsided with medication and rest. Clark's major joints and muscle groups were examined and found to be within normal limits for range of motion and strength. She was diagnosed with, inter alia, "[r]eflex sympathetic dystrophy of the right upper limb." See Transcript at 669. Medications that included methadone and gabapentin were prescribed, and sympathetic blocks were recommended.

On September 30, 2015, Dr. Calin Savu, M.D., ("Savu") performed a "[r]ight stellate ganglion block." See Transcript at 665. His summary of the procedure reflects that within fifteen minutes of completing the procedure, Clark reported "significant improvement in arm pain that was movement related." See Transcript at 665.

5

Savu subsequently performed two other right stellate ganglion blocks, one on December 9, 2015, and the second on January 14, 2016. See Transcript at 696-697, 713-714. Clark reported good results from the blocks, a reported confirmed by Savu, but Clark noted that her pain eventually returned.

Clark and her mother, Helen Hunter ("Hunter"), completed a series of documents in connection with Clark's applications. See Transcript at 273-279, 280-289, 290-291, 293-300, 303-310. In a disability report, Clark represented that she previously worked as a self-employed babysitter, a cashier at a gas station, a cook prep, and as a deli worker. She could no longer work because of high blood pressure and bipolar disorder.

In a function report, Clark represented that a typical day for her consists of making breakfast, sending her daughter off to school, cleaning around her house, napping, greeting her daughter upon her return from school, cooking supper, taking a bath, and going to bed. Clark can attend to her own personal care, prepare simple meals, and perform some household chores. In Section D of the report, she was asked to circle the items on a list that her conditions affect. On the list, she circled "understanding," "memory," "concentration," "completing tasks," and "getting along with others." See Transcript at 298. She did not circle "lifting," "reaching," or "using hands."

Clark testified during the first administrative hearing, as did Hunter. See Transcript at 36-48. There is little testimony relevant to Clark's ability to reach, handle, and finger objects, although Hunter testified that Clark has difficulty holding objects with her hands.

Clark also testified during the administrative hearing held after the Appeals Council's remand. See Transcript at 55-68. When asked what prevents her from working, she replied, "[b]asically my hands." See Transcript at 57. She stated that the fingers on her right hand are "completely numb," and she cannot pick up objects. See Transcript at 58. She further reported that were it not for her hand issues, she would probably be able to work as a babysitter. According to Clark, while the nerve blocks performed by Savu were helpful, the pain in her right arm and hand has grown worse. She believes that the right revision carpal tunnel syndrome releases performed by Guinn made the pain worse. Clark does not believe she can work a job that requires her to lift five to ten pounds occasionally or requires her to use her right hand for more than two to three hours a day.

The ALJ found at step two of the sequential evaluation process that Clark's severe impairments include bilateral carpal tunnel syndrome. The ALJ assessed Clark's residual functional capacity and found that she can perform unskilled, sedentary work. As a part of so finding, the ALJ found that Clark retains the ability to "lift and carry no more than 10 pounds occasionally and less than 10 pounds frequently ..." See Transcript at 20. With respect to Clark's carpal tunnel syndrome, the ALJ found the following:

> [Clark's] longitudinal medical history is not necessarily consistent with her allegations of disability. The medical evidence shows that [she] has been treated for bilateral [carpal tunnel syndrome]. However, it must be noted that on August 27, 2012 (about 9 months after her alleged onset date), [she] conveyed in her Function Report that she did not have limitation in her ability to use her hands (Ex. 5E, pg. 6). She was diagnosed with right [carpal tunnel syndrome] in October 2013, and underwent a right [carpal tunnel syndrome] release procedure, as well as a subsequent revision procedure on the right in September of 2014, along with treatment by injections. The undersigned has thoroughly reviewed all relevant evidence regarding [Clark's carpal tunnel syndrome] and notes that these

7

> procedures, along with follow-up treatment, have <u>been very effective in decreasing her [carpal tunnel syndrome] symptoms</u>.
> Treatment notes from Comprehensive Pain Specialists on May 20, 2015, show [Clark] <u>denied</u> joint pain, muscle spasm, neck pain, and back pain (Ex. 22 F, pg. 3). She did report pain and tenderness in her right arm. However, grip strength testing showed <u>handgrip strength at 4/5 right and 5/5 left hand</u> (Id.) This evidence indicates [Clark's carpal tunnel syndrome] treatment had been effective, and her symptoms were relatively mild on the right, and non-existent on the left.
>
> A musculoskeletal and neurological examination performed on September 14, 2015, showed the following:
>
>> Musculoskeletal: Motor strength and tone: <u>normal tone and motor strength</u>. Joints, bones, and muscles: <u>no contractures, malalignment, tenderness, or bony abnormalities and normal movement of all extremities</u>. Extremities: <u>no cyanosis or edema</u>.
>>
>> Neurologic: Gait and Station: normal gait and station. Cranial Nerves: grossly intact. <u>Sensation: grossly intact</u>. Coordination and Cerebellum: no tremor.
>
> Ex. 24 F, pg. 13 (emphasis added).
>
> The undersigned has considered all the evidence in the record, including that which was submitted after the previous hearing, in compliance with the [Appeals Council] Order. This evidence persuades the [ALJ] that [Clark's carpal tunnel syndrome] symptoms are virtually non-existent on the left and relatively mild on the right. Her [carpal tunnel syndrome] treatment appears to have been very effective. The evidence is compelling that she is capable of performing sedentary work with lifting and carrying restrictions at or below 10 pounds. Moreover, [Clark's] latest treatment records fail to show persuasive evidence of significant limitation in reaching, handling, fingering, or feeling.

<u>See</u> Transcript at 21. [Emphasis in original]. The ALJ did not impose a limitation on Clark's ability to reach, handle, or finger objects. The ALJ found at step four that Clark has no past relevant work but found at step five that there are jobs a hypothetical individual with Clark's limitations can perform. The ALJ concluded that Clark was not

disabled as defined by the Social Security Act from the alleged onset date of November 15, 2011, through the ALJ's April 1, 2016, decision.

Clark bears the burden of proving her residual functional capacity, which is an administrative determination reserved for the ALJ. See Cox v. Astrue, 495 F.3d 614 (8th Cir. 2007).[3] On the record now before the Court, it cannot be said that substantial evidence on the record as a whole supports the assessment of Clark's residual functional capacity. Clark has work-related limitations caused by carpal tunnel syndrome, and the ALJ erred when he failed to incorporate an adequate manipulative limitation into the assessment. The Court so finds for two reasons.

First, the reasons the ALJ gave for discounting the severity of Clark's carpal tunnel syndrome are not supported by substantial evidence on the record as a whole. The ALJ noted that Clark completed a function report on August 27, 2012, or about nine months after the alleged onset date, and did not report a limitation with respect to her ability to use her hands. Although it is true that Clark did not circle "lifting," "reaching," or "using hands" on the form, see Transcript at 298, it appears that she was merely addressing the impact her mental impairments have on her work-related abilities, not the impact her carpal tunnel syndrome has on those abilities. Moreover, the record indicates that she did not complain of pain in her right arm and wrist until October of 2013, or more than a full year after she completed the function report. See Transcript at 504-507. It is true that Clark did not initially allege carpal tunnel syndrome

---

[3]     The governing standard in this case, i.e., substantial evidence on the record as a whole, embodies a zone of choice within which the ALJ may decide to grant or deny benefits without being subject to reversal. See Culbertson v. Shalala, 30 F.3d 934 (8th Cir. 1994). If the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. See Dixon v. Barnhart, 353 F.3d 602 (8th Cir. 2003).

as a disabling impairment, and the ALJ can consider Clark's failure to do so, but the impairment is now before the ALJ and should be thoroughly considered.

The ALJ observed that Clark underwent a right carpal tunnel syndrome release, a subsequent revision procedure, and received treatments by injection. The ALJ then concluded that "these procedures, along with follow-up treatment, have been very effective in decreasing [Clark's carpal tunnel syndrome] symptoms." See Transcript at 21. It is true that Clark initially reported good results from the carpal tunnel syndrome release, but her pain eventually returned and caused her to seek additional medical attention. She described the subsequent pain as a throbbing pain with numbness and tingling, and she reported difficulty grasping objects.[4] Her physicians credited her renewed complaints of pain and prescribed medications and performed nerve blocks. Guinn credited Clark's complaints to such an extent that he performed a "[r]ight revision carpal tunnel syndrome release." See Transcript at 531. After the procedure, Clark continued to seek medical attention for her right wrist pain. She reported that the pain interfered with her daily activities, and she characterized her overall pain level as ten. Admittedly, her right hand grip strength was observed to be 4/5, and the results of musculoskeletal and neurological examinations were routinely within normal limits. The examinations, though, were not specific to her right wrist. For instance, the ALJ cited the May 20, 2015, treatment notes from Comprehensive Pain Specialists as evidence that her examinations were routinely within normal limits. In the same note, though, Clark's complaints were recorded to include "… right arm pain. It starts on her

---

[4] Clark reported at one point that she worked as a "cake decorator" and used her arms and hands frequently. See Transcript at 567. Her work history report does not reflect work as a "cake decorator," but does indicate she has past work as a "deli worker" and "cold prep." See Transcript at 303-310. It is unclear when she might have worked as a cake decorator, or whether her past work as a deli worker may have included cake decorating.

forearm and radiates down into [her] hands. She has numbness in her fingers." See Transcript at 672.

Second, notwithstanding the foregoing, the assessment of Clark's residual functional capacity does not adequately account for the work-related limitations caused by her carpal tunnel syndrome. The ALJ limited Clark to "lifting and carrying restrictions at or below 10 pounds." See Transcript at 21. The ALJ did not impose a limitation on her ability to reach, handle, or finger objects because the latest treatment records failed to show "persuasive evidence of significant limitation in reaching, handling, fingering, or feeling." See Transcript at 21. As recently as July 23, 2015, though, Clark complained of pain radiating from her right elbow to her hand. She reported that the pain was a burning pain, and her fingertips were numb. She reported that her pain was exacerbated by, inter alia, exercise, lifting, and work. Medications that included methadone were prescribed, and sympathetic blocks were performed by Savu. With respect to Clark's medications, the ALJ observed that the evidence does not show Clark has been prescribed "very extensive pain medication." See Transcript at 23. Clark has been prescribed methadone, though, a strong pain medication. Moreover, Clark testified that she does not believe she can work a job requiring her to lift five to ten pounds occasionally or requiring her to use her right hand for more than two to three hours a day.

It is for the foregoing reasons that substantial evidence on the record as a whole does not support the ALJ's assessment of Clark's residual functional capacity. A remand is therefore necessary. Upon remand, the ALJ shall re-assess the severity of Clark's manipulative limitations caused by carpal tunnel syndrome. As a part of doing so, the

ALJ shall re-evaluate the evidence and, if necessary, send Clark for a consultative examination.

The Commissioner's decision is reversed, and this case is remanded. The remand in this case is a "sentence four" remand as that phrase is defined in 42 U.S.C. 405(g) and <u>Melkonyan v. Sullivan</u>, 501 U.S. 89 (1991). Judgment will be entered for Clark.

IT IS SO ORDERED this 14th day of February, 2018.

_____
UNITED STATES MAGISTRATE JUDGE